In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-22-00032-CV

CENLAR FSB AND AMERIHOME MORTGAGE COMPANY, LLC,
Appellants

V.

JASON CHAMPAGNE AND BRANDY CHAMPAGNE, Appellees

On Appeal from the 60th District Court
Jefferson County, Texas
Trial Cause No. A-202,999

## MEMORANDUM OPINION

Appellants/Defendants Cenlar FSB (Cenlar) and AmeriHome Mortgage Company, LLC (AmeriHome) appeal that portion of the trial court's judgment in favor of Appellees/Plaintiffs Jason Champagne and Brandy Champagne.[1] We affirm in part, reverse and render in part, and we reverse and remand in part.

---

[1] As to Brandy, Jason's wife, the trial court entered a judgment against her on all of her individual causes of action. The only relief that the trial court awarded to Brandy in the final judgment pertains to the trial court's orders granting the

1

Procedural History and Evidence at Trial

On July 15, 2016, Jason entered into a loan agreement (the Note) with Houstonian Mortgage Group, Inc., and the Note was secured by a Deed of Trust covering the real property located at 10015 Jason Court, Beaumont, Texas 77705 (the Property).[2] The Note was later acquired by AmeriHome. The Note was for $257,122 and required Jason to pay monthly payments beginning September 1, 2016. The Note also included terms that monthly payments were due on the first of the month, failure to pay the full payment when due constituted default, and temporary forbearance of any payment did not waive the lender's right to require that payment subsequently under the Note or waive the lender's rights under the Deed of Trust. AmeriHome was the assignee of the Deed of Trust and the servicer of the loan, and Cenlar was a subservicer who sent communications in AmeriHome's name and acted on behalf of AmeriHome. In August of 2017, the Property flooded due to Hurricane Harvey.

Jason testified that two to three weeks after his house flooded due to Hurricane Harvey, he was contacted by AmeriHome about a forbearance program. Jason testified that he was not told much about the program, but from what he understood

---

Champagnes' motions for sanctions. AmeriHome appeals that part of the final judgment as to Brandy. AmeriHome appeals all other parts of the final judgment which awarded relief to Jason.

[2] Brandy did not sign the Note, but she signed the Deed of Trust as Jason's spouse.

the program provided while he was in the forbearance program, he would not have to make his mortgage payments, he would not accrue interest and costs on top of his normal mortgage payment and that, once he was done with repairs and AmeriHome's inspectors inspected and deemed the construction complete, then AmeriHome would give Jason options to become current with the loan. On September 6, 2017, AmeriHome sent Jason a letter (admitted as Plaintiffs' Exhibit 4) stating the following, in relevant part:

> This letter offers you a forbearance plan, which is a temporary suspension of your mortgage payments intended to allow you the time and flexibility to manage the challenges affecting your ability to pay your mortgage due to the natural disaster impacting you.
>
> Your loan is currently due for 9/1/2017 payment. The forbearance plan will begin on 9/1/2017 through 11/1/2017.
>
> During this time you will not be required to make a payment.
>
> The forbearance plan will end 12/1/2017 at which time you will be contacted to reassess your current circumstances as well as be provided information on alternatives that may be available to you. In addition, we may be requesting certain other information from you.
>
> Please note that your current loan requirements remain in effect; however, you are not required to make any payment during the term of the forbearance plan. The amounts otherwise due have been suspended during this time. In addition, such forbearance plan should not be understood or construed as a satisfaction or release in whole or in part of the amounts due or the other obligations contained in your loan documents.
>
> Loss mitigation options may have costs associated with them that you may be responsible for after completion of loss mitigation. Examples of these costs include title searches, appraisals and valuations. The costs

may vary depending on the loan information, geographic area, etc. Please contact us for information on costs that may be associated with your loss mitigation evaluation.

CREDIT REPORTING: Please note that we will not be reporting the delinquency status or the entry into a Forbearance Plan to credit reporting agencies.

CREDIT SCORING COMPANIES MAY CONSIDER WHETHER THERE IS AN INCREASED CREDIT RISK DUE TO THE LACK OF REPORTING. WE ARE UNCERTAIN AS TO THE IMPACT ON YOUR CREDIT SCORE, PARTICULARLY IF YOU ARE CURRENT ON YOUR MORTGAGE OR OTHERWISE HAVE A GOOD CREDIT SCORE.

Jason testified that, according to the September 6, 2017 letter from AmeriHome, the forbearance program would begin on September 1, 2017, and he would not be required to make a payment during the forbearance period. According to Jason, he relied on the letter's statement that during the forbearance program AmeriHome would not report his delinquency to credit reporting agencies, and he would have never entered the forbearance program had he known that his nonpayment would be reported to credit reporting agencies.

On or about November 3, 2017, AmeriHome sent Jason a letter (admitted as Plaintiffs' Exhibit 5) stating that it had not received his three mortgage payments for the months of September 2017 through November 2017, that he was in default of his loan, and it said that he owed "$.00 which is the total amount of any late charges incurred[,]" and the letter indicated that legal action may be taken which could result in him losing the home if he did not make these payments by November 26, 2017.

Jason testified that he was surprised by the letter since he had just started the forbearance program after relying on the letter dated September 6, 2017, stating the forbearance program would last until December 1, 2017.

On December 11, 2017, Jason received another letter (admitted at trial as Plaintiffs' Exhibit 7) from AmeriHome extending the forbearance period through February 1, 2018. The December 11th letter also stated that under the forbearance plan Jason would not be required to make a payment during the forbearance period and that his participation in the forbearance program and nonpayment would not be adversely reported to credit reporting agencies. Jason testified that he relied on those statements in not making any payments while he was repairing the Property and until the inspectors completed the inspection, and he relied on those statements as a basis for his understanding that his nonpayment would not be adversely reported to credit reporting agencies.

Jason testified that two days later, on December 13, 2017, AmeriHome sent another letter (admitted at trial as Plaintiffs' Exhibit 8) stating that (1) the forbearance extension through February 1, 2018 was a temporary suspension of his mortgage payments so that he could have the time and flexibility to manage the challenges affecting his ability to pay his mortgage because of the natural disaster impacting him, (2) his loan was currently due for the September 1, 2017 payment but that during the forbearance program he would not be required to make a payment,

(3) the forbearance plan extension would end on March 1, 2018, at which time he would be contacted to reassess his current circumstances, and (4) that no delinquency status or participation in the forbearance program would be reported adversely to credit reporting agencies. Jason testified that he relied on those statements in continuing to participate in the forbearance program offered by Appellants.

According to Jason, before starting the forbearance program his credit score was "a 750 to right at 800 credit score[,]" and he "took a lot of pride in it." However, in March 2018, after Jason did not pay the six forborne payments or resume making monthly payments, the Defendants reported Jason to the credit bureaus as delinquent for March 2018 and April 2018. On March 21, 2018, while attempting to purchase a vehicle at a car dealership, Jason learned that his credit score dropped because of "loan non-payment." According to Jason, AmeriHome "apparently had been turning [him] in for nonpayment," and he had been unaware until that point that AmeriHome had been reporting him for nonpayment to credit reporting agencies despite the earlier assurances otherwise in their letters. Jason testified that he contacted AmeriHome, and they responded, "Our mistake."

On April 10, 2018, AmeriHome sent Jason a notice of default and notice of intent to accelerate (admitted at trial as Defendants' Exhibit 11) stating that he needed to cure the default. The notice stated that the amount past due was

6

$12,009.84, and the letter told Jason he had until May 15, 2018, to cure the default. On May 24, 2018, Albertelli Law (ALAW) sent a letter to Jason stating that it represented Cenlar, the creditor and servicer of the Note, and that Jason owed a principal balance on the Note of $252,081.63, plus interest, escrow advances, corporate advances, and attorneys' fees and costs for a total claim amount of $266,015.72. The ALAW letter (admitted at trial as Plaintiffs' Exhibit 25) also notified Jason that if he was currently pursuing loss mitigation with the creditor, the letter was provided to Jason "for informational purposes" to notify him that ALAW had been retained. Jason testified that during the period represented as the forbearance period by Appellants, ALAW also sent Jason a letter dated May 25, 2018, and Notice to Occupants of Pending Acquisition that stated the mortgage was in foreclosure as a result of his default. The letter dated May 25, 2018 was admitted at trial as Plaintiffs' Exhibit 26.

On May 26, 2018, AmeriHome sent Jason another letter about an error in credit reporting (the "First Operational Error Letter" admitted at trial as Plaintiffs' Exhibit 28) stating the following, in relevant part:

> This letter is in response to your inquiry regarding our credit reporting. Due to an operational error, measures taken to protect against derogatory reporting were not extended to cover the necessary time period for the forbearance program. We have submitted a correction removing the delinquent reporting that occurred in March & April 2018. Please allow 30 business days for this correction to process. We apologize for any inconvenience this may have caused.

According to Jason, AmeriHome's operational error demonstrated that they had made derogatory reports of nonpayment on his credit.

On July 9, 2018, ALAW sent a letter to Jason giving notice of a substitute trustee's sale scheduled for August 7, 2018. Jason testified that at the time he did not believe he was in default because he was still communicating with AmeriHome regarding the additional programs they were telling him were going to be offered, and he was waiting on information about those programs. Jason testified that at that time, he and Brandy were back in the home, he had been doing ninety-nine percent of the repairs himself, and there was only minor trim work and some painting work left to be done on the home. Jason testified that, after continuously reaching out to AmeriHome and hearing nothing and not getting documentation from them as promised, he became nervous and sent AmeriHome a check for two months of payments. According to exhibits admitted at trial, on July 1, 2018, Jason sent a check in the amount of $2,500. Because the payment was not enough to bring the loan current, Appellants sent Jason a letter on July 24, 2018, and they returned the payment.

Defendants' Exhibit 46, titled "Loan Activity – All Notes 08/03/2016 – 01/15/2021" which included call notes from Cenlar Loan Administration and Reporting regarding the Note, showed an entry dated July 26, 2018, stating, "Cenlar add hold. System updated for the following event: User has placed the file on hold.

8

Hold reason: Loss mitigation workout. Hold comments: Please hold FC – borrower is eligible for FHA disaster partial claim modification Status: Active, awaiting approval. Hold start: 7/26/18 4:28:28 PM. Projected end: 09/01/2018[.]" Jason testified that from the beginning the Appellants had represented to him that once his home was deemed by their inspectors as rebuilt, the forbearance program would turn into a loan modification program. Jason testified that on July 30, 2018, he discussed loss mitigation options with Appellants, and they discussed what documentation was needed from him to apply for loss mitigation, and he understood the scheduled sale of the Property set for August 7, 2018 was cancelled so that he could submit the required loss mitigation documents.

According to Jason, he relied on Appellants' representations that from the date the forbearance program was in effect—September 2017 to September 2018—he relied on the representations in the forbearance letters that he was not delinquent between September 2017 and November 2018 before filing suit. And before and during the forbearance program, Jason testified he was cooperating and communicating with Appellants about his participation in the program. Jason testified that he could not remember exact dates, but from the time he was back in his home and repairs were complete, he was continuously reaching out to AmeriHome and requesting the documentation AmeriHome had promised to get the loan modified. According to Jason, it was a "daily battle for months" that "never

9

seemed to get anywhere with anyone[,]" and he stated he spoke to many people and "spent endless amounts of hours on the phone waiting on hold and waiting for the right representative and departments." Jason testified that he "sent in everything that was sent to [him]," and he sent AmeriHome documents from various fax machines, and he kept a "document trail" with time stamps.

According to Jason, on September 21, 2018, ALAW sent him another Notice to Occupants of Pending Acquisition stating that the loan was in foreclosure, but seven days later Jason received a letter from AmeriHome stating that it had received Jason's request for a loan modification or other foreclosure alternative and that AmeriHome would review the documentation and let Jason know if further documentation was needed. According to the September 21st AmeriHome letter, AmeriHome estimated it would take approximately thirty days to review Jason's loan modification application response package. Jason testified that because he was working with AmeriHome on supplying AmeriHome with requested documentation, Jason thought the ALAW letter he received seven days earlier stating the Property was in foreclosure was junk mail and "completely bogus." According to Jason, he sent AmeriHome all the documents they required from him, and he continued to believe that his agreement with AmeriHome suspending his mortgage payments on the Property while it was the loan forbearance program was still in effect.

On October 4, 2018, AmeriHome's Loss Mitigation Department sent Jason a letter informing Jason that his application for a Homeowners Assistance Program was incomplete. The letter listed the documents Jason would need to submit by November 18, 2018, to complete his application. On October 11, 2018, a Notice of Substitute Trustee's Sale was filed by the Substitute Trustee. The Notice stated that a public sale was scheduled for December 4, 2018. A letter dated November 6, 2018, from ALAW to Jason (admitted at trial as Defendants' Exhibit 40) stated that the law firm represented Cenlar, that the law firm was initiating legal proceedings in connection with the foreclosure of the Deed of Trust associated with the loan on the Property, that the maturity date of the Note had been accelerated, and that all sums secured by the Deed of Trust were immediately due. According to ALAW's letter, the amount due on the Note as of November 6, 2018, was $272,887.79. Attached to the letter was a Notice of Substitute Trustee's Sale, which states the Property will be sold on December 4, 2018. On the same day ALAW sent Jason the letter notifying him that Appellants were initiating legal proceedings, AmeriHome's Loss Mitigation Department sent Jason a letter stating the documentation he provided was being reviewed to determine whether the loan qualified for a "loan workout[,]" and it stated that his financial information was still incomplete or required an update. The letter stated that should Jason not provide the additional information, his "loan workout" could be denied.

In a letter dated November 13, 2018, from AmeriHome to Jason (the "Second Operational Error Letter" admitted as Plaintiffs' Exhibit 43), AmeriHome then apologized again and stated the following, in relevant part:

> This letter is in response to your inquiry regarding our credit reporting. Due to an operational error, measures taken to protect against derogatory reporting were not extended to cover the necessary time period for the forbearance program. We have submitted a correction removing the delinquent reporting that occurred in October 2018. Please allow 30 business days for this correction to process. We apologize for any inconvenience this may have caused.

Jason testified that this letter was in response to his inquiries about their derogatory credit reporting, that he would call and "go through the whole spiel[]" with Appellants' customer service, customer service representatives would admit that they could see that errors were made, and he was advised that management should be contacting Jason to address it. According to Jason, Appellants never attempted to contact him about the errors without him first contacting them about their derogatory reporting of his credit in the forbearance period. Jason testified that the Appellants' derogatory reporting adversely impacted his credit.

Jason testified that on November 21, 2018, he wrote the Loss Mitigation Department a letter and informed them that he had never received any documentation or phone calls as promised and that he had sent in the documents that representatives had requested from him. According to Jason, he sent the same documentation to the Loss Mitigation Department five to ten times, on "30 or 40

occasions [he] sent substantial documentation [including] everything they ever asked for plus some[,]" and he testified he spent hundreds of dollars faxing requested documentation. According to Jason, the letter he sent AmeriHome also explained that the night before he wrote the letter, a representative had told him they looked back and verified Jason's attempts to reach out, and the representative "was blown away" that Jason had not received the necessary paperwork or been contacted by a management team member to address the situation.

On November 27, 2018, the Loss Mitigation Department sent Jason a letter (admitted at trial as Plaintiffs' Exhibit 46) stating that AmeriHome had not received missing information it had requested from Jason twice and that the missing information was necessary to complete his application for a Homeowner's Assistance Program, and that AmeriHome was discontinuing processing the application because the deadline to provide the missing information had passed. The letter informed Jason that, to avoid a negative impact to his credit rating resulting from late payments and to avoid foreclosure, he needed to continue to make his mortgage payment on schedule. Jason testified that based on his agreements with AmeriHome or Cenlar and their communications with him he believed he was not in default, but that after receiving ALAW's correspondence, he decided to hire an attorney.

Jason testified that, despite what the November 27th letter said, he sent in everything the Appellants had asked for including the Uniform Borrower Assistance Form, a hardship letter, and pay stubs, and that he sent the documents timely and on more than one occasion. Jason testified that Appellants produced only seven recordings of calls in the discovery of this case, and he believed that there were "easily 75, probably over a hundred[]" calls. Jason testified that despite his attempts to communicate with Appellants, they were not attempting to have effective and clear communication with him in return. According to Jason, at one point, he began documenting his attempts to contact Appellants. Jason's personal notes document his calls with Appellants, and his efforts at sending documents to them. Jason's notes of the phone calls to Appellants were admitted into evidence as Plaintiffs' Exhibit 69.

On November 30, 2018, the Champagnes filed Plaintiffs' Application for Temporary Restraining Order, Temporary Injunction, Permanent Injunction and Original Petition against Cenlar, AmeriHome, and ALAW.[3] The Champagnes

---

[3] ALAW is not a party to this appeal. ALAW filed a Motion for Judgment Based on the Attorney Immunity Defense, and the trial court granted the motion and dismissed all claims against ALAW with prejudice.[3] In its Final Judgment, the trial court incorporated its March 3, 2021 Order Granting Motion for Judgment, which dismissed all claims against ALAW with prejudice, and the trial court incorporated its March 26, 2021 Order Granting Agreed Motion for Severance, which severed the Champagnes' causes of action against ALAW from this suit. We only refer to ALAW as necessary to the disposition of the appeal.

alleged causes of action against the Defendants for negligent misrepresentation, violations of the Texas Deceptive Trade Practices Act, violations of the Texas Debt Collection Act (TDCA), breach of contract, and promissory estoppel. The Champagnes also requested that the trial court restrain and enjoin the Appellants from foreclosing on the Property on December 4, 2018.

The trial court entered a temporary restraining order against Appellants preventing a foreclosure on the Property on December 4, 2018, and set the hearing on Plaintiffs' Application for Temporary Injunction for December 12, 2018. On December 12, 2018, the trial court enjoined the Appellants from issuing notices of foreclosure on the Property to the Champagnes and from attempting to conduct or conducting a foreclosure sale on the Property, and the trial court set the case for a trial on the merits. Jason testified that he ceased living in the Property in October of 2019, when it was flooded by Hurricane Imelda.

According to Jason, Appellants' attempts to foreclose on the Property caused him stress and "almost caused [him] a divorce and a lot of unrest at home." Jason testified that due to the derogatory credit reporting by Appellants, his credit score was "demolished," and he has had to deal with a "ridiculous" increase in his interest rates when buying vehicles, and after being affected by Hurricane Imelda, his credit union refused to give him a home improvement loan without an astronomical interest rate due to his credit issue even though he had banked with the credit union since he

15

was fifteen years old and they were aware of his "good reputation" and payment history. According to Jason, he had to rely on his father for financial help, which Jason testified made him feel "defeated[.]" Jason explained following Hurricane Imelda, he had even more damage to his home and had to "gut" his home again. In a telephone call with the Small Business Association (SBA) regarding its June 29, 2020 letter to him stating that his disaster loan application was incomplete, an SBA representative explained to him that this application would be denied because of the foreclosure proceeding.

Jason testified that about a month before trial when he stopped by the Property, he discovered the locks on the home had been changed, an electronic keypad had been installed, and he could not gain access to the home. Jason learned from his attorney that the locks were changed by Cenlar or AmeriHome based on Jason's alleged failure to keep up the house and yard. According to Jason, those allegations were false because his neighbors had helped mow the grass every week, and he had regularly stopped by and checked on his house. The testimony in the trial shows that the Appellants' locks were still on the Property when the trial occurred, but the Appellants had given Jason access to the home about three weeks after installing the locks. Jason testified that in a letter admitted as Plaintiffs' Exhibit 63, which is a letter the Appellants sent to Jason a year after he filed suit, Appellants offered Jason another forbearance plan for the Note.

Brandy, Jason's wife, testified that she and Jason have been married six years. According to Brandy, they put approximately $54,000 of equity into the Property, including the down-payment and approximately $18,000 in monthly payments. Brandy acknowledged that some of the $18,000 in payments were for interest, taxes, and insurance. Brandy testified that she did not sign the Note on the Property, and she said she never spoke or sent correspondence to anyone employed by Appellants. Brandy testified that when she saw the Property two weeks before the trial, it looked "the same[,]" it was not covered in graffiti or boarded up or falling apart, and the grass was cut like it usually was, which is weekly. Brandy also stated the interior of the home did not have mold, and Brandy said that in her opinion the Property was not in disrepair.

Chad Parish, a corporate representative of both AmeriHome and Cenlar, was called by Plaintiffs as an adverse witness. Parish listened to a recording of a telephone conversation on September 28, 2018, between Jason and one of Appellants' representatives, which was admitted into evidence during the trial. Parish agreed that in the recording, the representative never told Jason that he had failed to return the Universal Borrower Assistance Form. But, according to Parish, in the recording the representative stated that they had not received Jason's pay stubs, which were requested. Parish agreed that Appellants' call notes, admitted at trial as Defendants' Exhibit 46 state, "Faxed paystubs but only able to retrieve 1

17

from email need remaining paystubs for VOE." He testified to a September 28, 2018 entry on the call notes that state, "Loss Mitigation Note . . . Pay Stubs Received by Fax[,]" and that the call notes for November 1, 2018 also reflect that pay stubs were received by fax. Parish agreed that neither notation indicated that the pay stubs were incomplete, and that it was the policy and procedure of Appellants for representatives to mark records as incomplete if the records they received were incomplete. The call notes indicate that on November 27, 2018, Appellants received Jason's hardship letter and unsolicited bank statements. Parish testified Appellants do not dispute that Jason ultimately submitted the pay stubs the Appellants requested, his bank statements, a hardship letter, and a completed Universal Borrower Assistance Form. That said, Parish also testified that the Appellants never received Jason's HOA statements even though these were requested. Parish also admitted that the call notes included an incorrect notation that Jason's home is in Bexar County rather than Jefferson County.

Parish testified that, according to their defense attorney, Jason made fourteen calls to Appellants, but that Appellants only produced six call recordings in the case. Parish admitted that it was possible that recordings were missing and that he did not know what had been done to find the missing recordings.

Parish testified that because Jason's forbearance plan ended on February 28, 2018, as of March 1, 2018, Jason owed the six payments from September 1, 2017

through February 28, 2018 that he had not been required to pay while in forbearance. Parish testified that AmeriHome's letter to Jason dated April 10, 2018, provided a notice of default, and it notified Jason that the amount to cure the default was $12,009.84. Parish testified that Appellants' notes reflect that a foreclosure "hold" was placed on the account on July 26, 2018, because Jason was eligible for an FHA disaster partial claim modification. Parish testified that Appellants made efforts to get the documents from Jason for the loan modification, but the loan modification was denied because Jason did not submit the requested pay stubs before the deadline of August 1, 2018. According to Parish, a restart of the foreclosure process on September 11, 2018 "was necessary due to the fail[ure] of the loss mitigation." Parish testified that the letter dated September 13, 2018, from ALAW to Jason, notified Jason of the foreclosure decision. Parish explained that the letter dated April 10, 2018, stated that Jason needed to pay $12,009.84 to cure the default by May 15, 2018, which Jason did not pay, and the letter dated September 13, 2018 indicated the total amount owed after the acceleration of the debt and all costs that had been incurred up until that point.

Parish testified that the call notes reflect that Jason called Appellants on March 21, 2018, and Jason reported that he was at the dealership trying to buy a car but the dealer said it was "showing delinquent[.]" According to Parish, Appellants advised him that they were working to fix the problem if it was in error, Jason asked if they

could send him a statement verifying the mistake, and Appellants advised him that the credit bureau report issue should be fixed in a "short while[.]" Parish explained they had attempted to find the recording of that call but could not locate it. Parish testified that despite Jason receiving a letter in April 2018 stating that he was in default, that letter was a result of Appellants' improper coding, Parish agreed that Jason should not have been reported delinquent during that time, and Appellants' internal notes, which are dated May 26, 2018, reflect Appellants acknowledged that Jason should have been protected by the forbearance plan against the Appellants reporting he was delinquent. Parish testified that the First Operational Error Letter sent on May 26, 2018, had been sent in response to Appellants' mistaken adverse reporting to credit bureaus of Jason's loan as delinquent for March and April 2018, and Parish agreed that the error was "100 percent" Appellants' fault. Parish testified that there was another operational error when "coding was not corrected in order to suppress the credit reporting" for October 2018. After Jason contacted Appellants again, Appellants sent the Second Operational Error Letter on November 6, 2018, stating that they were submitting a correction removing derogatory delinquent reporting that occurred in October 2018, which would have been one month before ALAW's foreclosure letter. According to Parish, it was "very possible" that the derogatory reporting could have negatively impacted Jason's credit, Parish was not aware of anything Appellants did to try to ascertain what damage the derogatory

20

reporting did to Jason's credit, and Parish did not have any information to suggest that Jason's credit was not damaged by the derogatory reporting. Parish testified that, to his knowledge, Appellants never consulted with any experts or consultants to check on Jason's credit after the Appellants retracted their derogatory report.

Parish agreed that Appellants entered the Property without Jason's permission after the lawsuit was filed and during the litigation and he agreed some locks were changed, but Parish testified that Appellants' entry was "in compliance with" section 7 of the Deed of Trust. According to Parish, the entry was because "[i]t appeared that the grass or some vegetation was overgrown on the property, and it was also determined that it appeared to be vacant and no utilities . . . seemed to be on. So, the property inspection kind of determined that it's possible that the property was abandoned."

John Ulzheimer testified as an expert for the Plaintiffs. Ulzheimer is an expert in the consumer credit industry, he previously worked for FICO, which is credited with inventing the commonly used credit scoring system, and he has worked for a variety of credit-related companies such as Equifax and done expert witness work in credit-related lawsuits such as those dealing with the Fair Credit Reporting Act and the Fair Debt Collection Practices Act. According to Ulzheimer, he was retained to review Jason's credit reports, documentation from the SBA, and perform an analysis to determine if Appellants' credit reporting had any impact on Jason's credit and any

impact to his SBA loan application in 2019. Ulzheimer's expert report was admitted as Plaintiffs' Exhibit 93. Ulzheimer testified that he was not offering an opinion as to the accounting of Jason's loan or whether the loan was actually paid.

Ulzheimer explained that companies such as Appellants furnish information to credit bureaus and have certain obligations with respect to the accuracy of the information and investigating when consumers dispute that information. Ulzheimer reviewed Jason's January 27, 2020 Experian Consumer Disclosure Report, admitted at trial as Plaintiffs' Exhibit 96. Ulzheimer testified that the Experian report reflects that on October 17, 2019, the U.S. Small Business Administration performed a credit inquiry into Jason's Experian credit report and the results of the inquiry would have been reported to that agency that same day. Ulzheimer testified that in his opinion, had Appellants not erroneously reported Jason as currently delinquent,

> it would have removed a current delinquency on an obligation that was several hundred thousand dollars large and $51,000 delinquent. . . . So, to the extent that this SBA letter refers to that type of mismanagement of a debt obligation and had that not been present on Mr. Champagne's Experian credit report as of the date of the SBA's inquiry, then certainly that would have removed the most glaring issue with his credit report.

According to Ulzheimer, the SBA documents he reviewed in the case include language that supports his opinion that the derogatory reporting by Appellants was a cause of or, at the very least, a component of the SBA's decision to deny Jason's application for a loan. Ulzheimer reviewed the Automated Consumer Dispute Verification (ACDV) form that was completed by an AmeriHome employee and

22

processed on December 14, 2018, and the form included information AmeriHome sent back to Transunion in response to Jason's dispute of his credit report. Ulzheimer explained that the form reported Jason's loan as being 180 days past due by AmeriHome although the account history grid did not indicate delinquency at all. According to Ulzheimer, the November 13, 2018 Second Operational Error Letter was "actually very troubling" because it was basically thirty days before the ACDV, the ACDV indicated that Jason was more than a half-year and $30,000 delinquent, and the foreclosure proceedings had started.

Ulzheimer testified that he performed a credit impact analysis for Jason in this case, and one of Ulzheimer's findings was that Jason's credit score would have been higher had AmeriHome not improperly reported the status of his loan. Among the conclusions Ulzheimer's reached in his report, he states:

> The issue of impact materiality is not arguable as it pertains to the subject Amerihome credit entry. The difference in scores caused by the Amerihome entry is not only material, but extremely material given the number of interest rate/risk tiers transcended by the score differences.
>
> For example, according to Informa Research Services,[] there are six interest rate/ARP tiers for a garden variety 30-year fixed rate mortgage loan.[] These rate tiers start for people with FICO scores as low of 620 and cap out for people with FICO scores as high as 760+. Each of the six rate tiers has a different APR based on the consumer/applicant's FICO score.
>
> As of February 5, 2020, the average published interest rate for a 30-year mortgage for a consumer with a FICO score at or above 760 is 3.141%. The average published interest rate for a 30-year mortgage for a consumer with a FICO score between 620 and 639 is 4.73%. The

23

interest rates descend from 4.73% to 3.141% as the consumer's FICO score climbs from 620 to at least 760, transcending six different rate tiers based on their FICO score.

In the Plaintiff's case, the FICO score range of 570-620 would, at worst, place the Plaintiff below the minimum score requirement for a 30-year mortgage and, at best, place the Plaintiff at the absolute score requirement. This means, based on score alone, the Plaintiff would either be denied a 30-year mortgage or would have qualified by 1 credit score point for the worst average mortgage loan APR, 4.73% as of February 5, 2020.

If, however, the Plaintiff's Amerihome account did not contain negative information the Plaintiff's FICO score would be 710 to 760. A score of 710 would place the Plaintiff in the 2nd best risk tier for 30-year mortgages and a 760 would place the Plaintiff in the best tier for 30-year mortgages. At 710 to 760 the Plaintiff would be five and six risk tiers better than if he had a 570 to 620 FICO score.

As such, not only was the impact of the Amerihome credit reporting measurable but also material.

In Ulzheimer's affidavit admitted into evidence at trial, he also concluded that the derogatory credit reporting by AmeriHome led to a decrease in Jason's credit score and it "can, if it hasn't already, negatively impact insurance premiums, credit card interest rates, and other financial terms such as auto loan interest rates." Ulzheimer testified that he reviewed a screen capture of a text message between Jason and a representative of Neches Federal Credit Union in which the representative indicated to Jason that Jason would be denied for a home improvement or equity loan because his credit report included a foreclosure.

Ulzheimer performed a credit impact analysis and testified about the impact the negative reporting by AmeriHome had on Jason's financial life. Ulzheimer opined that:

> . . . . Any consumer who has credit scores that low should expect - - they should expect a variety of things.
>
> No. 1, there are certain lenders that simply won't do business with you, Like American Express doesn't have a subprime product. It doesn't exist. So, you know, you're eliminating options from mainstream lenders when you have scores this low. So, that's No. 1, is your options start to shrink. . . .
>
> No. 2 is you should be comfortable with being denied credit. You should become comfortable with that because - - like to the extent this Neches Credit Union text that we saw, this would indicate - - it's not a denial letter, obviously; but it certainly indicates what they feel about that type of credit reporting. The SBA letter is a denial letter. So, again, someone who has credit scores this low should start - - they should start experiencing credit denials because they're just simply too risky in the eyes of some lenders. That's No. 2.
>
> No. 3 - - and this might be the worst of all of them - - is that to the extent that you're so desperate that you have to take some form of credit because you just need it for some reason, then the cost to service that type of debt is going to be - - is going to be priced out at subprime rates. So, for credit cards you should feel comfortable with 29.99 percent or more. For auto loans you should feel comfortable in the high teens. For mortgage loans, unless you're doing like a hard money loan, but even - - if you even are approved, then you should feel comfortable with interest rates that are in the high single digits, which doesn't sound very high, but it is for a mortgage.
>
> So, what it does is it . . . eliminates the competition for your business, I guess is a good way of putting it; and it really makes - - it puts the ball in the subprime lender's court because they know that you don't have any other options but to accept punitive terms. So, to the extent that Jason really wants to go out and get auto loans and credit cards and find lenders that are willing to do this type of business with him, he should expect to pay very high interest rates as a result of these scores.

According to Ulzheimer, if AmeriHome does nothing with their credit reporting, the negative credit reports remain on Jason's credit report until probably late 2024. Ulzheimer testified that the derogatory reporting could impact Jason's insurance rates as well because insurance companies often use a variation of a credit score which is based off consumer credit reports to set rates.

Reginia Rodriguez, the foreclosure manager of ALAW, was called as a witness by the Plaintiffs. Rodriquez testified that ALAW was the firm that provided Appellants legal advice on Jason's loan and the foreclosure proceedings that involved his loan. Rodriguez testified that in her business with Cenlar, Cenlar sends a demand letter before referring a loan to foreclosure, as doing so is required by the terms of the loan. According to Rodriguez, when ALW proceeds with foreclosure, it relies on the amounts and the cure amount that is stated in the demand letter that the Appellants send to a borrower. Rodriguez agreed that Appellants need to provide accurate information about the default and the action required to cure the default. Rodriguez testified that the demand letter is part of the referral package ALAW receives when ALAW receives a notice to begin a foreclosure proceeding. Rodriguez agreed that the Champagnes are entitled to rely on the statement AmeriHome made in its September 6, 2017 letter stating no payments were required during the term of the forbearance plan. According to Rodriguez, the Champagnes were delinquent on the loan as of September 6, 2017 because a payment was due

September 1, 2017, despite the fact they were on the forbearance plan. Rodriguez agreed that the statement dated September 2017 did not say that the Champagnes were delinquent, but it shows a payment due date of October 1 and the amount due is double the monthly payment, which Rodriguez testified would indicate that the Champagnes' payments for both September and October were due. Rodriguez testified that the Champagnes were technically in default in September and October 2017 because those two payments were still due even though they were in the forbearance program.

Rodriguez agreed that Appellants' letter of November 3, 2017—informing the Champagnes that if the money for the September 1, 2017 payment through the November 1, 2017 payment is not received by November 26, 2017 then legal action may be instituted—was inconsistent with Appellants' letter of September 6, 2017 which stated that the forbearance plan would end on December 1, 2017. Rodriguez agreed that Appellants' letter of December 11, 2017 stated that the forbearance plan would include payments beginning on December 1, 2017 through February 1, 2018, and Appellants were sending these letters informing the Champagnes that they were not required to make payments, but Appellants were also sending them letters demanding money from them before the end of the forbearance period. According to Rodriguez, the Champagnes were "delinquent" but not required to make their payments while their loan was in forbearance.

Rodriguez explained that Appellants' demand letter dated April 10, 2018, notified Jason of the default, the amount necessary to cure the default, and the fact that his failure to cure would result in acceleration of the loan. According to Rodriguez, the letter of July 9, 2018, from ALAW to Jason, notified him that ALAW was initiating legal action, advised Jason of the foreclosure sale, and stated that the amount of the debt as of the date of the notice was $266,015.72. Rodriguez testified that the foreclosure sale scheduled for August 7, 2018 was abandoned because Appellants placed a "hold" on the foreclosure for loss mitigation efforts. Rodriguez testified that even though the amount due changed, the earlier demand letter was accurate because the "due date" had not changed.[4] According to Rodriguez, under circumstances like the ones at issue here, a borrower would have needed to request a new reinstatement or payoff amount after the August 7th sale was placed on hold. Even so, Rodriguez agreed that this was not required under the Deed of Trust, and she agreed that paragraph 22 of the Deed of Trust required the notice to state, among other things, the action required to cure the default. Rodriguez testified that normally a lender sends a demand letter with the referral for foreclosure, but that with Appellants' second referral for foreclosure, ALAW did not send a new demand letter that differed from the letter it sent on April 10, 2018. According to Rodriguez, when

---

[4] Rodriguez did not state in her testimony the date she referenced by use of the phrase "due date."

28

ALAW sent the letter dated September 13, 2018, notifying Jason of the new foreclosure sale, ALAW did not know whether Jason was in loss mitigation. Rodriguez agreed that the letter of September 13, 2018, states that, if Jason was in loss mitigation or in efforts to obtain a forbearance or loan modification, the letter was for "informational purposes" only.

Rodriguez agreed that no evidence shows the Champagnes made any mortgage payments between July 2018 and November 2018 (between the first and second letters from ALAW notifying the Champagnes of the foreclosure sale). Consequently, Rodriguez said more money would be required than what is stated in ALAW's demand letter to bring the Champagnes current on the loan. Rodriguez agreed that the Deed of Trust created a contractual obligation for Appellants to send the Champagnes a letter with the amount they were required to pay to cure their default. According to Rodriguez, there was no new demand letter for the second referral for foreclosure even though the amount they owed for defaulting on their loan had increased, but she said ALAW had the right to proceed without a new demand letter with an updated correct amount to cure because the due date from the new referral and the earlier demand letter matched. Rodriguez testified that ALAW's letter of November 6, 2018, states that federal law gives a borrower thirty days after receipt of the letter to dispute the validity of the debt or any part thereof. Rodriguez explained that the second scheduled foreclosure sale did not go forward because the

Champagnes filed their lawsuit before the thirty days expired and the trial court issued a temporary restraining order and injunction. According to Rodriguez, ALAW was not aware that Appellants were going to change the locks on the Property after the injunction was entered and litigation was pending, and ALAW knew that permission had to be given to go on someone's property while a case involving the property was in active litigation. In addition to the testimony from the witnesses outlined above, the Champagnes' attorney testified about the reasonableness and necessity of the attorney's fees and expenses the Champagnes incurred in the case. Additional evidence was admitted at trial to support the award of attorneys' fees.[5]

During the trial, the Champagnes filed a Motion for Discovery Sanctions, and the trial court granted the motion on June 9, 2021. The trial court sanctioned Appellants $13,889.61 for violating Rule 196.7 of the Texas Rules of Civil Procedure, $1,543.29 per page of a six-page e-mail string that was not produced until trial, and $2,150 in attorney's fees. During trial, the Champagnes also filed a motion for spoliation sanctions, and the trial court granted that motion on June 9, 2021. The trial court sanctioned Appellants $1,543.29 for each of twenty-two phone calls that the trial court found Appellants spoliated, plus $7,150 in attorney's fees.

---

[5] Because our disposition negates the need to address Appellants' challenge to the trial court's award of Jason's attorney's fees in Finding 17, we need not discuss in detail the evidence relating to those fees.

In its Final Judgment, the trial court rendered judgment for the Defendants on all claims asserted by Brandy, all claims asserted by Jason under the Texas DTPA, and all claims asserted by Jason for promissory estoppel. The trial court ordered that Brandy take nothing on her claims and that Jason take nothing on his DTPA and promissory estoppel claims, and that the Defendants would not recover court costs from Brandy or Jason. The court rendered judgment in favor of Jason on his claims for breach of contract and for violations of sections 392.304(a)(8) and 392.304(a)(14) of the Texas Finance Code. The trial court ordered that Jason recover from Appellants, jointly and severally, $509,787.02 in actual damages, $106,950 in attorney's fees, as well as court costs, post-judgment interest, and conditional appellate fees. The Final Judgment incorporates the trial court's June 9, 2021 orders sanctioning Defendants for $25,349.35 for discovery violations and $41,102.38 for the spoliation of evidence, and the judgment states that it disposes of all claims and all parties.

Upon Appellants' timely request, the trial court entered findings of fact and conclusions of law. Appellants timely filed a Motion to Modify, Correct, or Reform the Judgment, which was overruled by operation of law. Appellants filed Objections to Findings of Fact and Conclusions of Law and a Request for Additional and Amended Findings of Fact and Conclusions of Law, but the trial court declined to enter additional or amended findings. Appellants timely appealed.

## Issues on Appeal

Appellants raise six issues on appeal. In issues one through four, Appellants challenge the legal sufficiency of the evidence supporting certain findings by the trial court. In issues five and six, Appellants argue the trial court abused its discretion in imposing spoliation and discovery sanctions against Appellants.

## Standard of Review

The parties elected to try the case to the bench. Therefore, the trial court, as factfinder, was the sole judge of the credibility of the witnesses and weight of the evidence, and it was responsible for resolving conflicts in the evidence and drawing reasonable inferences from basic facts to ultimate facts. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819-21 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004). "When a trial court makes specific findings of fact and conclusions of law following a bench trial and a reporter's record is before the appellate court, the findings will be sustained if there is evidence to support them, and the appellate court will review the legal conclusions drawn from the facts found to determine their correctness." *MacPherson v. Aglony*, No. 09-21-00004-CV, 2022 Tex. App. LEXIS 7105, at *36 (Tex. App.—Beaumont Sept. 22, 2022, no pet.) (mem. op.) (citing *Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 789 (Tex. App.—Houston [14th Dist.] 2016, no pet.)). Findings of fact have the same force and dignity as a jury's verdict and are reviewable under the same standards of legal and factual sufficiency.

*Foley v. Capital One Bank, N.A.*, 383 S.W.3d 644, 646 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

In a legal sufficiency challenge, we credit evidence that favors the finding, if a reasonable factfinder could, and we disregard evidence to the contrary to the challenged finding unless a reasonable factfinder could not disregard it. *See City of Keller*, 168 S.W.3d at 827. When a party challenges the legal sufficiency of the evidence on an issue for which it did not have the burden of proof, the appellant must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). The reviewing court considers the evidence in the light most favorable to the finding to determine if there is any probative evidence or reasonable inferences therefrom, which support the finding. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981). The court disregards all evidence and inferences to the contrary. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex. 1992).

We review a trial court's ruling on a motion for sanctions for an abuse of discretion. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). "The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but 'whether the court acted without reference to any guiding rules and principles.'" *Cire*, 134 S.W.3d at 838-39 (quoting *Downer v. Aquamarine*

33

*Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985)). We reverse the ruling only if it was arbitrary or unreasonable. *Id.* at 839. We also review a trial court's imposition of sanctions for spoliation under an abuse of discretion standard. *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014).

Findings 14 and 15

In issue one, Appellants argue that no evidence supports Findings 14 and 15 on Jason's breach of contract claim. Findings 14 and 15 by the trial court state the following, in relevant part:

D. Breach of Contract

14. Plaintiff asserted two theories for breach of contract: (1) a contract arising from or pertaining to the forbearance program and (2) the improper acceleration of the underlying note.[] As to the first theory, Plaintiff lost. As to the second, Plaintiff prevailed.

> . . . .
> (2) Breach of Contract – Plaintiff Prevails
>
> . . . [T]he language of the contract specifies the following:
>
> Lender shall give notice to Borrower prior to acceleration the following Borrower's breach of any covenant or agreement in this Security Instrument [. . .]. The notice shall specify (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the property [(Defs.' Ex. 2, ¶22)].[]
>
> . . .

34

On or about April 10, 2018, Defendants inform Plaintiff he is in default to the tune of $12,009.84 and the amount to be accelerated (unpaid principal balance) is $252,081.63.[] This is the first and only notice of default letter sent by Defendants.[] Indeed, Plaintiffs' Ex. 9 and Defendants' Ex. 11, which are identical, are the notice of default, required by ¶22 of the deed of trust (contract).

On or about May 24, 2018, Defendants, by and through their attorneys—ALAW—inform Plaintiff the principal balance owed is $252,081.63.[] . . . .

But the envisioned and/or noticed foreclosure, sale, legal action, etc. never followed.[]

On or about September 13, 2018, Defendants, by and through their attorneys—ALAW—inform Plaintiff the principal balance owed is again $252,081.63.[] . . . .

On or about November 6, 2018, Defendants, by and through their attorneys—ALAW—inform Plaintiff the balance owed is now, somehow, $272,887.49 [(Def's Ex. 40)].[] . . . .

. . . .

"Texas courts have consistently held that the terms set out in a deed of trust must be strictly followed." *Univ. Sav. Ass'n v. Springwoods Shopping Ctr.*, 644 S.W.2d 705, 706 (Tex. 1982). Strict compliance with the deed of trust is required to protect the debtor. *Id.*[]

So, . . . Mr. Champagne's deed of trust with Defendants calls upon the Defendants to specify the default and the action required to cure it.[] . . . . [W]here the evidence shows different amounts between the notice of intent to default and accelerate (*i.e.*, Defendants' Ex. 11 and Plaintiffs' Ex. 9[]) and the notice of acceleration (*i.e.*, ALAW's letters: Defs.' Ex. 25 and Ex. 40, in particular the latter) the Defendants are, per the black letter terms of the note (deed of trust), in breach.[]

Q: (By [Plaintiffs' attorney]) All right, looking at this letter, Ms. Rodriguez, April 10th, 2018 – we looked at this letter before; and you said that's a demand letter, right?

35

A:     [Regina Rodriguez, Corporate Representative for ALAW] Yes.

Q:     Is this the demand letter that goes in hand with this notice of foreclosure sale letter from ALAW?

A:     Yes.

Q:     Can you do the notice of foreclosure without an accurate demand letter?

A:     We have to have a demand letter sent prior to us beginning our foreclosure proceedings.

[. . .]

Q:     If we scroll down a little bit further, we can see that there was a sale set of the home for August 7th, 2018, right?

A:     Yes.

Q:     Did that sale go forward?

A:     No, it did not.

Q:     Okay, So, what does that do to [. . .] your notice letter to accelerate and the demand letter that accompanied it?

A:     The demand letter remained accurate because the – they continued to be due for September 1st, 2017. As far as our notice of sale, this notice was posted, the file was placed on hold, the sale did not take place. So, we would have to have a new referral to be able to begin a new foreclosure proceeding.
Q:     And we already talked about the demand letter, though. It would be accurate for this time frame but not if the amount to cure changes, does it?

36

A:     Yes.

Q:     You agree with that, that you can't send a demand letter in 2017 with the amount to cure in it and then wait until 2018 or '19, after considerable further nonpayment, and not tell him an accurate amount to cure. AmeriHome/Cenlar can't do that, can they?

A:     The demand letter remains accurate because the due date didn't change.

Q:     But the default did. The amount of the default did change.

A:     Correct. The borrower would have to request a new reinstatement and/or payoff amount to get that accurate information.

Q:     Okay. Well, that's not what the agreement says. . . . Let's go back to Exhibit 2, Defendants' 2, page 16, paragraph 22.

Q:     (By [Plaintiffs' attorney]) Here we go. This says: Lender shall give the notice to borrower. Do you see that, first line?

A:     Yes.

Q:     And then it says: The notice shall specify the default, the action required to cure the default, a date not less than 30 days from the date the notice is given to borrower by which the default must be cured. Did I read that correctly, that portion?

A:     Yes, you did.

Q:     This doesn't say that the borrower has to ask for this information, does it?

A:     No, it does not.

37

Q: And like I said, the default changes as time goes on, doesn't it?

A: Yes, it does.

Q: And the action required to cure a default in 2018 is not going to be the same as it was in 2017 if the borrower continues to fail to make payments, right?

A: Correct.

Q: And this doesn't say that AmeriHome/Cenlar can send a letter in 2017 and then just – then foreclose a year and a half, two years later, does it?

A: No.[]

. . . . Hence, the Court awarded the following damages for the Defendants' breach of contract—failure to specify the default (*e.g.*, amount to cure)—:
(a) Economic Damages of $272,887.49[]; and
(b) Reasonable attorney's fees of $106,950.[]
(c) Total: $379,837.49[]

A footnote in the findings following the block quote of the exchange between Plaintiffs' attorney and Rodriguez states that, "As the exchange quoted above details, the terms of the default—what Mr. Champagne must do to cure—are different, the amounts are different."

According to Appellants, Jason's prior material breach by being in default due to late payments from October 1, 2016 through August 1, 2017 precludes him from

38

prevailing on his breach of contract claim.[6] Appellants also argue that the evidence conclusively establishes that Appellants did not breach the contract because (1) the Notice of Default complies with the Deed of Trust, (2) the district court's finding that Appellants' breached the contract by not re-noticing the default ignores the plain language of the contract and the undisputed and conclusively established facts, (3) no new notice of default was required, and (4) the evidence on which the trial court relied does not support Findings 14 and 15. Additionally, Appellants argue that there is no evidence that Jason suffered any actual damages as a result of the breach.

The elements of a cause of action for breach of contract are: (1) the existence of a valid contract; (2) that the plaintiff performed or tendered performance; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged as a result of the breach. *Sullivan v. Smith*, 110 S.W.3d 545, 546 (Tex. App.—Beaumont 2003, no pet.). In finding against Appellants on Jason's breach of contract claim, the trial court relied on the Deed of Trust, Appellants' April 10, 2018 demand letter to Jason, the letters from ALAW to Jason giving him notice of acceleration and scheduled foreclosure sales, and Rodriguez's testimony. Rodriguez testified that the April 10, 2018 demand letter was sent to Jason as part of the foreclosure package for ALAW to proceed with foreclosure, and it stated that the amount required to cure the default

---

[6] Because we sustain issue one on other grounds, we need not address Appellants' argument that Jason's prior material breach precludes him from prevailing on his breach of contract claim. *See* Tex. R. App. P. 47.1.

39

was $252,081.63. ALAW sent Jason a May 24, 2018 letter stating that $252,081.63 was the principal balance owed, and Rodriguez testified that the scheduled foreclosure sale on August 7, 2018, did not happen. Rodriguez agreed that on November 6, 2018, ALAW sent Jason a new notice of acceleration and foreclosure sale that stated that the amount to cure the default was $272,887.49, despite Appellants not having provided a new notice of default to Jason with that amount as the amount to cure the default. Viewing the evidence in the light most favorable to the finding, we conclude that this evidence is some probative evidence supporting the trial court's finding that Appellants breached the Deed of Trust by failing to provide Jason with a new notice of the amount to cure the default as required by paragraph 22 of the Deed of Trust. That said, we cannot sustain the trial court's breach of contract finding in favor of Jason on his breach of contract claim if he failed to produce any evidence of damages sustained *as a result of the breach*. As for the damages awarded by the trial court for the breach of contract claim, the trial court awarded economic damages of $272,887.49, the amount of the Note accelerated, and explained in a footnote that it had "elected to apply the greatest number alleged[.]"

The goal in measuring damages for a breach-of-contract claim is to provide "just compensation for the loss or damage actually sustained." *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (quoting *Stewart v. Basey*, 245 S.W.2d 484, 486

(Tex. 1952)). "The normal measure of damages in a breach-of-contract case is the expectancy or benefit-of-the-bargain measure." *Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 607 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The purpose of this measure of damages is to restore the injured party to the economic position it would have occupied had the contract been performed. *Id.* "To restore an injured party to the position he would have been in had the contract been performed, it must be determined what additions to the injured party's wealth have been prevented by the breach and what subtractions from his wealth have been caused by it." *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 148 (Tex. App.—Dallas 2012, no pet.). For breach of contract, a plaintiff can recover economic damages but not exemplary damages or mental anguish. *Statewide Bank & SN Servicing Corp. v. Keith*, 301 S.W.3d 776, 786 (Tex. App.—Beaumont 2009, pet. abated) (citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006)).

It is uncontested that Jason has not made any payments on his loan on the Property since approximately September of 2017 (other than an attempt to make a payment in July 2018, in the amount of $2,500, which was rejected). Jason argues on appeal that his damages "are the home they bargained for, the value of which is approximately equal to the principal balance of the loan." He also argues that his expectancy damages are, at a minimum, the $54,000 in equity that he has in the home. He further argues that his damages are "those incurred as a result of the impact

to his credit, which are supported by expert testimony and explicitly permitted under Texas law[,]"[7] and that his damages "also include an insurance check for certain flood related repairs to his home." The Property has not been sold at a foreclosure sale, Jason has not paid mortgage payments since the forbearance, there is no evidence that Jason has lost whatever equity he held prior to the alleged breach, no evidence that Jason lost the home he bargained for under the loan and Deed of Trust, and no evidence in the record to support Jason's claim that Appellants' failure to send another demand letter with the current amount to cure the default in compliance with the Deed of Trust caused him any actual damages.[8]

---

[7] The evidence Jason presented at trial about damage to his credit pertained to Appellants' derogatory credit reporting during the forbearance program and the First Operational Error Letter and the Second Operational Error Letter. Jason did not present evidence at trial that the breach of the deed of trust caused him to suffer injury to his credit, nor did the trial court find that the alleged breach caused or resulted in a damage to Jason's credit. At trial, Jason used a different damage model for his unfair debt collection claims than he used for his alleged breach of contract claim. Jason now argues on appeal that the damage to his credit which he included in his unfair debt collection practices claim (discussed below) is also a recoverable damage under his breach of contract claim. The trial court did not award Jason any damages for damage to his credit on the breach of contract claim, and Jason did not file a cross appeal on that issue.

[8] Jason argues on appeal that he was entitled to, at the very least, nominal damages. However, we note that he is not entitled to nominal damages because he did not seek nominal damages in his live pleading, and instead he sought, but failed to prove, actual damages. *See MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 664-65 (Tex. 2009).

So, we sustain Appellants' first issue. We reverse the trial court's judgment in favor of Jason on his breach of contract claim and render judgment for the Defendants on the breach of contract claim.

Finding 11

In issue two, Appellants argue that no evidence supports Finding 11 on Jason's claim that Appellants violated section 392.304(a)(8) of the Texas Finance Code. Section 392.304(a)(8) of the TDCA prohibits the use of "fraudulent, deceptive, or misleading representation" by a debt collector, including "misrepresenting the character, extent, or amount of a consumer debt[.]" *See* Tex. Fin. Code Ann. § 392.304(a)(8). To prevail on this unfair debt collection claim, Jason must show something more than simply different payoff amounts being communicated to him by the lender or loan servicer. *See Douglas v. Wells Fargo Bank, N.A.*, 992 F.3d 367, 374-75 (5th Cir. 2021) ("misrepresenting the amount of debt is not enough for a section 392.304(a)(8) claim; the misrepresentation must cause borrowers to 'think differently with respect to the character, extent, amount, or status of their debt[]'") (quoting *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 723 (5th Cir. 2013)); *Gibson v. U.S. Bank Trust N.A.*, No. 3:21-cv-02210-G-BT, 2023 U.S. Dist. LEXIS 166586, at *19 (N.D. Tex. Aug. 31, 2023); *Gardner v. Specialized Loan Servicing LLC*, No. 3:21-cv-2804-G-BN, 2023 U.S. Dist. LEXIS 57159, at *30 (N.D. Tex. Mar. 8, 2023). Additionally, he must show that this

violation caused actual damages. *See* Tex. Fin. Code Ann. § 392.403(a)(2). Appellants argue that this Court should reverse the trial court's judgment on this claim and render judgment in Appellants' favor because there is no evidence that Appellants misrepresented the character, extent, or amount of a consumer debt, and there is no evidence that any such misrepresentation caused Jason to sustain any actual damages.

On appeal, Appellants specifically take issue with the following portion of Finding 11:

| Date of Statement | Amount Due: | Total Accelerated Amount Due[]: |
|---|---|---|
| April 17, 2018* | $14,548.03 | No figure provided |
| May 17, 2018* | $17,102.47 | No figure provided |
| June 18, 2018* | $19,611.44 | No figure provided |
| July 17, 2018* | $23,545.14 | $269,558.52 |
| August 17, 2018* | $26,479.11 | $269,588.52 |
| September 17, 2018* | $28,988.88 | $269,588.52 |
| October 2018* | $31,964.10 | $273,778.23 |
| November 19, 2018* | $35,750.87 | $275,874.65[] |

*For each of these months, the outstanding principal on the statements reflect a figure of $252,081.63.[]

Simple arithmetic reveals that as between the July, August, and September loan statements, the figures provided for the total accelerated amount due has to be wrong for a least two (2) of the months – September should have a larger figure than August and August should have a larger figure than July. But more than that, the September 13, 2018 and November 6, 2018 letters informing Mr. Champagne that the balance owed is $272,887.49 is in direct contradiction of the September 17, 2018 and November 19, 2018 loan statements' figures of $269,558.52 and $275,874.65, respectively.[] Yes, the cold hard, black letter evidence of the Defendants' several misrepresentations speaks for itself.

44

Therefore, the Court awarded the following damages for the Defendants' misrepresentation of the character, extent, or amount of the consumer debt (mortgage):

(a) Actual Damages: $145,641.02;[40]
(b) Reasonable attorney's fees of $106,950.[]
(c) Total: $252,591.02[]

According to Appellants, the trial court did not determine which (if any) of these representations was a misrepresentation or how many misrepresentations there were. Appellants complain that footnote 40, explaining how the trial court arrived at the actual damages amount, was also an "arbitrary" determination:

[40] . . . . To arrive at [the Actual Damages] figure, the Court took the difference of the alleged amount owed $272,887.49 and the principal balance owed $252,081.63—$20,805.86—and multiplied the same by the number of months between the April 10, 2018 default letter (Defs.' Ex. 11) and the November 6, 2018 letter (Defs.' Ex. 40), which is seven (7) months. Thus, the total is $145,641.02.

Appellants contend that there is no evidence of a misrepresentation because Jason failed to compare "a represented amount with the true amount of the debt[;]" the trial court failed to find which of the representations, if any, were misrepresentations; and without that finding, no damages can be ascertained; and that, although the months of April 2018, May 2018, June 2018, and October 2018 were included in the damages multiplier, the trial court did not find that Appellants misrepresented the amount of debt in those months. Additionally, Appellants argue that there is no evidence to support the award of actual damages because (1) there is no evidence of any economic damages the alleged misrepresentations caused Jason, (2) Jason did

45

not testify as to any stress or mental anguish resulting from the alleged misrepresentations, (3) Jason's testimony regarding any stress or struggles did not rise to the level of compensable mental anguish, and (4) the trial court's actual damages award is arbitrary.

Even if we assume without deciding that the evidence supports the trial court's finding that the loan statements Jason received from April 2018 through November 2018 or the letters dated September 13, 2018 and November 6, 2018 constituted misrepresentations of the amount of the debt and a violation under section 392.304(a)(8) of the Texas Finance Code, we conclude that the trial court erred in finding for Jason on this claim because Jason failed to provide some evidence of something more than a simple misrepresentation of an amount due and he failed to provide any evidence of actual damages suffered as a result of this alleged misrepresentation. *See* Tex. Fin. Code Ann. § 392.403(a)(2); *Douglas*, 992 F.3d at 374-75; *Miller*, 726 F.3d at 723; *Gibson*, 2023 U.S. Dist. LEXIS 166586, at *19; *Gardner*, 2023 U.S. Dist. LEXIS 57159, at *30.[9] We sustain issue two. Accordingly,

---

[9] Jason argues that mental anguish damages are recoverable. Jason testified that Appellants' attempts to foreclose on the Property caused him stress and almost a divorce, and Brandy testified that Jason's dealings with Appellants since September 2017 had consumed him and caused him stress. Even assuming without deciding that such damages are recoverable, there was no evidence that Jason's alleged mental anguish was a result of Appellants' alleged violations of section 392.304(a)(8).

we reverse the trial court's judgment on the claim under section 392.304(a)(8) of the Finance Code and render judgment for Defendants on that claim.

Finding 12

In issue three, Appellants argue that no evidence supports Finding 12 on Jason's claim that Appellants violated section 392.304(a)(14) of the Texas Finance Code. Section 392.304(a)(14) prohibits a debt collector from "representing falsely the status or nature of the services rendered by the debt collector or the debt collector's business[.]" *See* Tex. Fin. Code Ann. § 392.304(a)(14). In its Finding 12, the trial court stated that the following language in Defendants' letters to Jason regarding the forbearance program falsely represented that Defendants would not adversely report Jason's credit:

> CREDIT REPORTING: Please note that we will not be reporting the delinquency status or the entry into a Forbearance Plan to credit reporting agencies.[]

Finding 12 stated further:

> Here, the Court was persuaded that under this cause of action, the Defendants' [First Operational Error Letter and Second Operational Error Letter], alone, were enough to support an award for damages for false representation of services associated with the forbearance program—to wit, credit suppression.[] If ever the trial of this matter required greater evidence, the Court would point again to the Defendants' self-serving loan activity notes, which admit the same failures.[]
> To demonstrate the totality of the Defendants' failures in this matter, the Court takes special care, and time, to note that after a year of litigation, Defendant Amerihome wrote Plaintiff and offered to place him into a forbearance program.[]

47

Therefore, the Court awarded the following damages for the Defendants' admittedly false representations concerning credit report suppression:
(a) Economic Damages of $91,258.51[]; and
(b) Reasonable attorney's fees of $106,950.[]
(c) Total: $198,208.51[]

Appellants argue that when the forbearance letters are considered in context with the other letters, these letters only promised suppression of credit reporting during the forbearance period, there is no evidence that Appellants reported the loan as delinquent during the forbearance period, the operational error letters do not support such a finding, and there is no evidence of damages to support the trial court's award of $91,258.51 in economic damages in Finding 12.

Viewing the evidence in the light most favorable to the finding, we conclude the First Operational Error Letter and the Second Operational Error Letter constitute some evidence that Appellants falsely represented they would not adversely report to the credit bureaus the nonpayment of the loan, and the facts show they did adversely report the nonpayment of the loan. Jason's testimony, as well as Ulzheimer's testimony, expert report, and affidavit, provide some evidence that Jason sustained economic damages as a result of Appellants' false statements that they would not adversely report the nonpayment of the loan. Jason testified that Appellants' derogatory credit reporting caused him to incur higher interest rates on automobile purchases, and that he was denied an SBA loan, and home equity loan or home improvement loan from his credit union. In Ulzheimer's testimony and

48

expert report, he explained that Appellants' derogatory credit reporting would subject Jason to higher interest rates and possibly higher insurance rates and denials of credit.

That said, neither Jason nor Ulzheimer provided testimony or evidence to support the trial court's $91,258.51 award. Accordingly, we sustain issue three in part, reverse the trial court's judgment in favor of Jason on his claim under section 392.304(a)(14) of the Finance Code, and remand the case for a new trial on that cause of action.[10]

### Finding 17

In issue four, Appellants contend that no evidence supports the trial court's award of attorney's fees in Finding 17. Based on our disposition of issues one through three, we need not address issue four. *See* Tex. R. App. P. 47.1.

### Sanctions for Spoliation

In issue five, Appellants argue the trial court abused its discretion in imposing sanctions for spoliation of evidence. During trial, Plaintiffs filed a Motion for Sanctions for Spoliation of Evidence, and argued that Appellants had responded to

---

[10] Because there is some evidence that Jason suffered damages as a result of Appellants' alleged violations of section 392.304(a)(14) but the evidence does not support the trial court's $91,258.51 award, we may either remand the case to the trial court for a new trial or suggest a remittitur. *See Garza v. Cantu*, 431 S.W.3d 96, 108 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citing *Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007)). We conclude, the record contains insufficient evidence from which this Court can calculate a remittitur.

Plaintiffs' Requests for Disclosure that they had no witness statements described in Rules 192.3(h) and 194.2(i) of the Texas Rules of Civil Procedure and responded to Plaintiffs' Request for Production that Appellants would produce responsive documents to Plaintiffs' request for " . . . all written or *recorded* statements of these Plaintiffs or any of their agents, servants, employees or representatives, regarding any matter at issue in this lawsuit: regardless of whether or not signed[.]" Plaintiffs attached Appellants' discovery responses and Appellants' call logs and call notes as exhibits to the motion. Plaintiffs alleged that Appellants failed to produce all recordings of conversations between Appellants and the Champagnes, and that Appellants had admitted at trial to failing to produce at least seven phone calls. Plaintiffs asserted in the motion that the call log Appellants produced indicates "way, way more missing calls than just the seven (7) or eight (8)" that Appellants admit are missing. Plaintiffs argued that Appellants unfairly relied on the incomplete record of phone calls in cross-examining Jason at trial and referred to Parish's testimony regarding missing phone call recordings. Plaintiffs argued that although the recordings were initially requested before July 18, 2019, the calls that *were* made available to Plaintiffs were produced on August 19, 2020, just five days before trial. According to the motion, Appellants had still failed to produce any additional recordings, and the missing recordings were relevant because they speak to how Appellants misrepresented the status of the loan and admissions made during the

50

calls by Appellants and their representatives, and therefore the phone calls would aid the Plaintiffs in presenting their case. Plaintiffs argued that Appellants had a duty to preserve the call recordings, that Appellants breached that duty, and that Plaintiffs suffered prejudice as a result of the breach because Appellants used some of the calls produced to Plaintiffs' detriment at trial, but then spoliated other calls that, according to the call notes, would have benefitted Plaintiffs. Plaintiffs sought death penalty sanctions, or in the alternative a spoliation presumption, sanctions of striking pleadings, and monetary sanctions of $6,600 for drafting the motion (not including time billed for the hearing) and $1,543.29 per twenty-two phone calls not produced, for a total of $40,552.38.

In its Order Granting Plaintiffs' Motion for Sanctions for Spoliation of Evidence, the trial court denied Plaintiffs' request for death penalty sanction(s) against the Defendants, denied a spoliation presumption, and denied the motion to strike portions of Appellants' pleadings. The trial court then granted Plaintiffs' request for sanctions of $1,543.29 per phone call recording not produced, the trial court determined that there were twenty-two calls that had not been produced, and the trial court granted attorney's fees in the amount of $7,150.[11] In its Order, the trial court included the following findings of fact:

1. There is a direct relationship between the offensive conduct and sanctions in that Amerihome Defendants sought to use

---

[11] Appellants do not appear to appeal the award of $7,150 in attorney's fees.

Defendants['] Exhibit 46 to impeach the testimony of the Plaintiffs but failed to produce the best record of evidence—phone call recordings. The evidence adduced at trial indicated these call logs are not entirely accurate—such as the call logs' improper identification of the home in Bexar County, Texas (San Antonio) and mismatching of the actual phone call recordings. This includes, but is not limited to, the phone call recordings that Amerihome Defendants had the ability to maintain here and didn't. *See* Trial Tr., Vol. 2, 46:6-13. While the timing of the first production of seven (7) phone call recordings is unbecoming, ultimately their timing was not clearly to the disadvantage and/or prejudice of Plaintiffs—this trial began in January 2021, not August. Nevertheless, Amerihome Defendants' failure to locate the remaining phone call recordings—at a time when their ability to record such phone calls was, by all accounts, both feasible and reasonable—is not just problematic but patently disadvantageous and therefore prejudicial to the Plaintiffs' case. Stated differently, Amerihome Defendants sought the benefit of their self-created and self-interested record—Defendants' Exhibit 46—without the hind[]rance of phone call recordings, at least one of which painted Defendants[] in bad light. *E.g.*, *Plaintiffs' Exhibit 103* ("RX[S], 10-17-2018 phone call), and all of which were clearly relevant.

2. The sanctions are not excessive. Here, Plaintiffs, in their *Motion for Sanctions for Spoliation of Evidence*, requested much more than the Court has granted. As such, the Court, as trier of fact, will weigh the evidence in accordance with Texas law, refrain from entertaining a rebuttal[sic] presumption and from striking the Defendants' pleadings. However, the Defendants' blatant and unapologetic disregard for the Texas Rules of Civil Procedure cannot and will not be ignored.

    (a)    Death Penalty Sanction(s) – Because death penalty sanction(s) have not been granted, the sanctions are not excessive.

    (b)    Spoliation Presumption – Because a spoliation presumption has not been granted, the sanctions are not excessive.

    (c)    Pleading Striking – Because the Court refuses to grant Plaintiff's requests to strike the pleadings of the Defendants, the sanctions are not excessive.

At the core of this Court's rulings and order is the very simple, equitable, and just notion that Amerihome Defendants' Exhibit 46 cannot be a sword shielded by the spoliation of phone call recordings, which might otherwise pierce it.[fn]

(d) Phone Call(s) Penalization – The assignment of a given number per phone call, here is $1,543.29. The figure quoted is equal to the approximate monthly payment owed by the Plaintiffs to the Defendants – their mortgage note. This Court, having sat as trier of fact and law in this matter and having listened to the testimony, reviewed the mass of exhibits submitted therein and thereto, finds that the figure quoted is apt and that twenty-two (22) phone calls were spoliated. Plaintiffs, as borne out through their testimony and the scant phone calls produced, jumped through hoop and hurdle to keep their home and abide by the Amerihome Defendants disjointed, incomplete demands. Ultimately, Amerihome Defendants sought monthly payment for the servicing of a loan that they, by their own repeated admissions—e.g., error letters, *Plaintiffs' Exhibit 103* ("RX[S], 10-17-2018 phone call), etc.—failed to properly service. Thus, it is only fitting that the penalty per spoliated phone call be equal to the monthly payment owed by the Plaintiffs.

(e) Reasonable legal costs of *Motion* – Because Plaintiffs' counsel has not sought an excessive fee and the amount of time spent drafting the motion does not appear to be an exercise in billing but a necessity, the legal costs of the motion are not excessive. If anything, Plaintiffs' counsel's hourly billable rate is within the average for the Jefferson County bar. The Court considers not only the evidence attached to the briefing, but the evidence adduced at trial and submitted regarding attorney's fees.

(f) Reasonable legal costs of hearing – Because Plaintiffs' counsel has not sought an excessive fee and the amount of time spent arguing this matter in the hearing before this Court, the legal costs [of] such hearing are not excessive. If anything, Plaintiffs' counsel's hourly billable rate is within the average for the Jefferson County bar. The Court considers not only the evidence attached to the briefing, but the evidence adduced at trial and submitted regarding attorney's fees.

3. It is necessary that Amerihome Defendants be sanctioned as outlined above and summarized below because it simply cannot be

53

that Amerihome Defendants are permitted to maintain their own account of the interactions between these now adverse parties (*See* Exhibit 46), without also having to produce recordings of phone calls that Amerihome Defendants admit were informative (*See* Trial Tr., Vol. 2, 35:6-20) but failed to maintain let alone search for. (*See* Trial Tr., Vol. 2, 35:6-20). Where Amerihome Defendants warn each and every one of their consumers (*i.e.*, Plaintiffs), whose loans they service, that the phone calls between the parties are being recorded, such defendants cannot then elect to produce a scant few. A party's duty under Tex. R. Civ. P. 194 is absolute. Regardless, this Court considered Defendants' submissions and arguments for this motion, and finds them wholly lacking. Thus, these sanctions are necessary.

4. Therefore, it is ordered that Defendants are sanctioned in the total amount of $41,102.38.

The footnote to the findings stated:

That Defendants' Exhibit 46 more than likely would and/or could be prejudiced by the missing phone call recordings is evidenced not the least by their absence but also by the presence of Plaintiff's Exhibits' 28, 43, and 103 – admissions of operational errors and the loss of documents dutifully and responsively sent Amerihome Defendants by Plaintiffs.

A spoliation analysis involves a two-step judicial process: (1) the trial court must determine, as a question of law, whether a party spoliated evidence, and (2) if spoliation occurred, the trial court must assess an appropriate remedy. *Brookshire Bros.*, 438 S.W.3d at 14. To conclude that a party spoliated evidence, the court must find that (1) the spoliating party had a duty to reasonably preserve evidence, and (2) the party intentionally or negligently breached that duty by failing to do so. *Id.* The party alleging spoliation has the burden of establishing that the nonproducing party

had a duty to preserve material and relevant evidence and breached that duty either negligently or intentionally. *See id.* at 20-21.

After finding that spoliation occurred, the trial court must exercise its discretion to impose an appropriate sanction, considering the spoliating party's culpability and the prejudice to the non-spoliating party. *Id.* at 21; *see also Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 488-89 (Tex. 2014). As with any discovery sanction, the sanction must be proportionate; it must relate directly to the conduct giving rise to the sanction and must not be excessive. *Brookshire Bros.*, 438 S.W.3d at 14, 21-22. While a trial court's discretion to remedy an act of spoliation is broad, it is not limitless. *Petroleum Sols.*, 454 S.W.3d at 489. The trial court must consider the availability of lesser sanctions and, "'in all but the most exceptional cases, actually test the lesser sanctions.'" *Id.* (quoting *Cire*, 134 S.W.3d at 841). "'[A] trial court either must impose lesser sanctions first or must clearly explain on the record why the case is an exceptional case where it is fully apparent that no lesser sanctions could promote compliance.'" *In re N. Houston Pole Line, L.P.*, No. 09-19-00384-CV, 2020 Tex. App. LEXIS 196, at *6 (Tex. App.—Beaumont Jan. 9, 2020, orig. proceeding) (quoting *Knoderer v. State Farm Lloyds*, No. 06-13-00027-CV, 2014 Tex. App. LEXIS 10538, at *29 (Tex. App.—Texarkana Sept. 19, 2014, no pet.) (mem. op.)). Though findings are not required in an award of sanctions, findings may be "helpful" in assisting an appellate court in determining whether the trial court

55

abused its discretion. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 852 (Tex. 1992); *see also TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 919 n.9 (Tex. 1991) ("It would obviously be helpful for appellate review of sanctions, especially when severe, to have the benefit of the trial court's findings concerning the conduct which it considered to merit sanctions . . . .").

Specifically, Appellants argue that the trial court's finding of spoliation of evidence in destroying recordings of twenty-two phone calls was an abuse of discretion because (1) the Champagnes waived their right to seek discovery sanctions because they failed to obtain a pretrial ruling on their Requests for Production or about the nonproduction of the alleged call recordings; (2) Appellants had no duty to preserve the alleged call recordings before late November 2018 because Appellants were not aware that there was a chance that a claim would be filed before November 2018; (3) there was no evidence that the alleged call recordings existed or that Appellants destroyed them; (4) the call recordings were not responsive to any discovery request or were not material; (5) spoliation did not prevent the Champagnes from putting on their case; and (6) the monetary sanction imposed is not directly proportional to any spoliation.

Appellants argue, relying on *Remington Arms Co., Inc. v. Caldwell*, 850 S.W.2d 167, 170 (Tex. 1993), that the Champagnes waived their right to seek discovery sanctions because they did not seek any pretrial rulings about their

Requests for Production or about the nonproduction of the call recordings. The Texas Supreme Court concluded in *Remington Arms* that "the failure to obtain a pretrial ruling on discovery disputes that exist before commencement of trial constitutes a waiver of any claim for sanctions based on that conduct[,]" but "if pretrial discovery abuse is not revealed until after the trial has begun, or even after trial, a party cannot be said to have waived a claim for sanctions." 850 S.W.2d at 170. Under *Remington Arms*, "waiver bars a trial court from awarding posttrial sanctions based on pretrial conduct of which a party 'was aware' before trial; lack of 'conclusive evidence' is not an excuse." *Meyer v. Cathey*, 167 S.W.3d 327, 333 (Tex. 2005) (citing *Remington Arms*, 850 S.W.2d at 170).

According to Plaintiffs' Motion for Sanctions for Spoliation of Evidence as well as Appellees' brief on appeal, the extent of Appellants' discovery abuse was not known by the Plaintiffs until Parish's cross-examination at trial revealed that there were twenty phone calls that had not been produced and he did not know the reason why. According to the record, prior to trial and during the pretrial discovery, the Plaintiffs were aware of the phone calls that Jason testified he either made or received, and Jason knew all his calls had not been produced by the Defendants even if he may not have known an exact number. We conclude that the Plaintiffs' failure to obtain a pretrial ruling on their Requests for Production or about the nonproduction of the call recordings amounts to a waiver, and it bars the trial court

57

from awarding a posttrial sanction for that pretrial conduct. *See Remington Arms*, 850 S.W.2d at 170.

Given our ruling as outlined above, we need not decide whether the trial court erred in failing to link the sanction directly to the conduct giving rise to the sanction or whether the amount was excessive. We sustain issue five. We reverse the trial court's order on the spoliation sanctions and vacate that order.

Discovery Sanctions

In issue six, Appellants assert that the trial court's discovery sanctions were an abuse of discretion. On February 25, 2021, Plaintiffs filed a Motion for Discovery Sanctions (1) for Appellants' "last minute production of e-mails (Plaintiffs' Exhibit 106[])" that Appellants' corporate representative testified he relied on for his trial testimony and are either not privileged because they are not addressed to nor copied to defense counsel and were responsive to Appellants' discovery requests and (2) for Appellants' entry on the Property after the agreed order setting for the discovery deadline and in violation of Rule 196.7 of the Texas Rules of Civil Procedure.

According to Appellants, the trial court abused its discretion in imposing sanctions in the amount of $9,259.74 against Appellants for not producing e-mails regarding credit reporting because the e-mails were privileged communications, and even if not privileged, the e-mails were not responsive to the ten requests the Champagnes identified. Appellants also argued that the trial court's $13,889.61

sanction against Appellants for entering upon the Property to secure the home during the pendency of litigation was an abuse of discretion because (1) the Champagnes agreed that if they abandon the Property that Appellants could enter and secure the Property, and (2) even if the Champagnes did not waive Rule 196.7 of the Texas Rules of Civil Procedure in the Deed of Trust, the rule does not apply because Appellants entered the Property to protect the collateral under the express language of the Deed of Trust and not to conduct discovery.

Courts follow a two-part test in determining whether a particular sanction for discovery abuse is just:

> First, a direct relationship must exist between the offensive conduct, the offender, and the sanction imposed. To meet this requirement, a sanction must be directed against the wrongful conduct and toward remedying the prejudice suffered by the innocent party. Second, a sanction must not be excessive, which means it should be no more severe than necessary to satisfy its legitimate purpose. This prong requires the trial court to consider the availability of lesser sanctions and, in all but the most exceptional cases, actually test the lesser sanctions.

*Petroleum Sols.*, 454 S.W.3d at 489 (citations and internal quotation marks omitted). As stated above, "'a trial court either must impose lesser sanctions first or must clearly explain on the record why the case is an exceptional case where it is fully apparent that no lesser sanctions could promote compliance.'" *In re N. Houston Pole Line, L.P.*, 2020 Tex. App. LEXIS 196, at *6 (quoting *Knoderer*, 2014 Tex. App. LEXIS 10538, at *29).

On December 13, 2019, the trial court entered an Amended, Agreed Discovery Control Plan Order that provided that all discovery must be accomplished on or before May 4, 2020. Texas Rule of Civil Procedure 196.7(a) provides that

> [a] party may gain entry on designated land or other property to inspect, measure, survey, photograph, test, or sample the property . . . by serving—no later than 30 days before the end of any applicable discovery period— . . . a request on all parties if the land or property belongs to a party[.]

*See* Tex. R. Civ. P. 196.7(a)(1).

In the trial court's Order Granting Plaintiffs' Motion for Discovery Sanctions, the trial court granted Plaintiffs' request for $13,889.61 for the violation of Texas Rule of Civil Procedure 196.7, $1,543.29 per page of six e-mails not produced until the time of trial, and $2,200 in attorney's fees for the pursuit of the motion for discovery sanctions.[12] The trial court included the following findings in its Order in support of the sanctions:

1. There is a direct relationship between the offensive conduct and sanctions in that these sanctions are in direct response to the Amerihome Defendants' inexcusable, blatant disregard for a prior court order and, most especially, the Texas Rules of Civil Procedure. Amerihome Defendants judicially admitted facts supporting this order.
2. This sanction is not more severe than necessary to promote full compliance with well established Texas law. Tex. R. Civ. P. 1 ("The proper objective of rules of civil procedure is to obtain a just, fair, equitable and impartial adjudication of the rights of litigants under established principles of substantive law. [. . .]").

---

[12] Appellants do not appeal the award of $2,200 in attorney's fees.

60

(a) Violation of Tex. R. Civ. P. 196.7 – Tex. R. Civ. P. 2 and 196.7 provide this Court with all the guidance it needs to make an informed ruling. Nowhere within either rule, nor the Texas Rules of Civil Procedure, are contracts between parties afforded a special exception to the same. Here, [the Property] is the very sort of property covered by Tex. R. Civ. P. 196.7 and this case is the very sort of case covered by Tex. R. Civ. P. 2. In spite of an existing, controlling, amended, *agreed* court order, Defendants, who otherwise failed to file any request or motion pursuant to Tex. R. Civ. P. 196.7, violated both the Rules and the Court's DCO. *See Amended, Agreed Discovery Control Plan Order.* Such conduct is inexcusable. In determining an appropriate penalty, the court first considered Tex. Pen. Code § 30.05 Criminal Trespass. As a Class B Misdemeanor, the Defendant's conduct would warrant a fine not to exceed $2,000.00. *See* Tex. Pen. Code §12.22. However, this is not a court of criminal jurisdiction. Nevertheless, the Court has a solution. Defendants are to be assessed $1,543.29 (the figure quoted is equal to the approximate monthly mortgage payment owed by the Plaintiffs and does not exceed $2,000) for each of the following: (1) Failing to request entry onto the property to conduct their inspection; (2) Failing to file a motion to gain entry onto the property to conduct their inspection, assuming such a request had been denied; (3) Failing to notice a hearing on a motion to gain entry onto the property to conduct their inspection, assuming such a request had been denied and a motion filed; (4) the Defendants' trespass; (5) changing the locks on the property; (6) informing Plaintiff after the fact that the trespass occurred and that the locks had been changed; (7) violating the *Amended, Agreed Discovery Control Plan Order*, which closed the discovery period on May 4, 2020; (8) Failing to obtain an extension to conduct additional discovery—property inspection—by Rule 11 agreement; and (9) Failing to move the court for a second amended discovery control plan order. Thus, for these violations Defendants are ordered to pay as a penalty $13,889.61.

(b) E-mails penalization – Tex. R. Civ. P. 193.5 governs a party's duty to amend or supplement a response to written discovery. As admitted on the record, Amerihome Defendants' corporate representative relied upon "internal communications" and "internal [ . . .] e-mails" for his testimony. Trial Tr., Vol. 2, 108:21-109:7. These e-mails, contrary to a representation made by Amerihome

Defendants' counsel were not subject to any privilege, *i.e.*, attorney-client. *See id.* Such conduct—trial by surprise—is inexcusable. As before, the penalty shall be equal to $1,543.29, which is equal to the approximate monthly mortgage payment owed by the Plaintiffs. Thus, Defendants are ordered to pay $9,259.74 as a penalty.

(c) Reasonable legal costs of *Motion* – Because Plaintiffs' counsel has not sought an excessive fee and the amount of the time spent drafting the motion does not appear to be an exercise in billing but a necessity, the legal costs of the motion are not excessive. The Court considers not only the evidence attached to the briefing, but the evidence adduced at trial and submitted regarding attorney's fees.

(d) Reasonable legal costs of hearing – Because Plaintiffs' counsel has not sought an excessive fee and the amount of time spent drafting the motion does not appear to be an exercise in billing but a necessity, the legal costs of the motion are not excessive. The Court considers not only the evidence attached to the briefing, but the evidence adduced at trial and submitted regarding attorney's fees.

3. It is out of necessity that this Court sanctions Amerihome Defendants as outlined above and summarized below because the conduct complained of is unapologetic and brazen. While the Texas Rules of Civil Procedure shall be given a liberal construction, the Tex. R. Civ. P. 196.7 is black letter. One does not simply waive a rule of civil procedure by pre-trial, pre-dispute, contract. Although, such a contract, even if entered, would certainly be adhesive. Worse, the Amerihome Defendants' inexcusable ignorance of the Honorable 60th Judicial District's prior but still binding at the time *Amended, Agreed Discovery Control Plan Order*, the terms of which Amerihome Defendants agreed to, is all the more troubling. In a suit for alleged breach of contract, Amerihome Defendants['] disregard for the discovery control plan to which it agreed is ironic. Further still, Amerihome Defendants' mid-trial production of e-mails its representative admitted were not privileged is as much a violation as any. For even if the emails were subject to privilege, Amerihome Defendants owed Plaintiffs a privilege log. *See Pls.' Reply to Cenlar and Amerihome's Resp. to Pls.' Mot. For Disc. Sanctions*, Ex. A; *See also* Tex. R. Civ. P. 193.3. (To that end, Amerihome Defendants['] refusal to follow the well-established clear by its language Texas Rules of Civil Procedure requires sanction. Regardless, this Court considered Defendants'

submissions and arguments for this motion, and finds them wholly lacking. Thus, these sanctions are necessary.

4. Therefore, it is ordered that Defendants are sanctioned in the total amount of $25,349.35.

As for the e-mails, the trial court could have reasonably determined that the e-mails were not privileged and that they should have been produced and were responsive to Plaintiffs' discovery requests. Also, the trial court could have reasonably disbelieved Appellants' argument that the entry onto the Property was not for discovery purposes but was to secure the Property under section 7 of the Deed of Trust, and the trial court could have reasonably decided that the entry onto the Property was in violation of 196.7 of the Texas Rules of Civil Procedure. We cannot say the trial court abused its discretion in determining that the conduct warranted sanctions.

That said, we cannot agree with the amount of the sanctions awarded by the trial court. Here, the amount of the sanctions was calculated by the trial court by multiplying the alleged sanctionable actions by the amount of Jason's monthly mortgage payment per page for the failure to produce the e-mails and awarding the amount of the monthly mortgage payment and then multiplying that amount for alleged failure of the defendant to seek permission of the trial court to inspect and enter onto the Property. The trial court's calculation using monthly mortgage payments and then multiplying that amount by alleged violations does not relate directly to the conduct giving rise to the sanctions, and the amount is excessive. *See*

*Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 373 (Tex. 2014); *Low*, 221 S.W.3d at 621; *TransAmerican*, 811 S.W.2d at 917. We sustain issue six in part, we reverse the trial court's order on the discovery sanctions, vacate that order, and remand the discovery sanction amount for further determination by the trial court.[13]

## Conclusion

We affirm the trial court's judgment as to the take-nothing judgment against Brandy for her causes of action and as to the take-nothing judgment against Jason on his DTPA and promissory estoppel claims. We reverse the trial court's judgment in favor of Jason on his breach of contract claim and render judgment for the Defendants on that claim, and we reverse the trial court's judgment on the claim under section 392.304(a)(8) of the Finance Code and render judgment for Defendants on that claim. We reverse the trial court's judgment in favor of Jason on his claim under section 392.304(a)(14) of the Finance Code and remand the case for a new trial on that cause of action. We reverse the trial court's orders on the spoliation sanctions and the discovery sanctions, vacate those orders, and remand

---

[13] *See State v. PR Invs. & Specialty Retailers, Inc.*, 180 S.W.3d 654, 676 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (concluding that sanction was excessive and remanding for trial court to consider what amount of monetary sanctions would be just and not excessive); *Felderhoff v. Knauf*, 828 S.W.2d 272, 274 (Tex. App.—Fort Worth 1992, writ denied) (remanding sanctions issue after concluding that sanctions imposed were excessive); *Cf. Low v. Henry*, 221 S.W.3d 609, 614-15, 620-21 & n.5 (Tex. 2007) (listing factors to guide trial court, on remand, in determining sanction amount available under Civil Practice and Remedies Code Chapter 10).

the discovery sanction issue for further determination by the trial court. Considering our rulings as outlined above, we also reverse and remand the trial court's award of $106,950 in attorney's fees.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.

LEANNE JOHNSON
Justice

Submitted on February 9, 2023
Opinion Delivered January 18, 2024

Before Golemon, C.J., Horton and Johnson, JJ.